You started our year off well, thank you. We'll move now to case number two of the day. This is 23-2617, United States v. Coleman. And Mr. Roy, we'll begin with you. All right, thank you, Judge. Good morning. May it please the court, opposing counsel. My name is Michael Roy on behalf of Appellant Lamont Coleman. We raise three claims for appeal. First, this court should vacate Coleman's – sorry, reverse Coleman's conviction for possession of a firearm because of a constructive amendment. Second, we ask this court to remand for a hearing on Coleman's motion for new trial under Rule 33. And then finally, Coleman's sentence should be vacated and the case should be remanded for re-sentencing. On the second issue, was there a request for an evidentiary hearing in the district court? I would need to get back to you on that, Judge, double-check on the record. But I can jump ahead to that claim if that's where you'd like to start. That's fine, thank you. Okay. I want to make clear that we – in terms of the Rule 33 motion, we're not saying that Coleman's filings so far have already proved a claim, that he should be entitled to a new trial or new Franks hearing, just that he has done enough to have a hearing on the issue. And we ask this court to adopt the standard used for 2255, 2254 pleadings as we lay out in the briefs. Although this court has not explicitly stated, as far as I can find, the standard for when a hearing should be held on a motion for new trial, it has recognized that there will be instances where a hearing is required. And I think the Tenth Circuit's analysis in Velarde makes sense on why the pleading facts that, if taken as true, would entitle the pleader to relief is a workable standard for Rule 33 motions as well as 2255 motions. However, even if this court were to follow the government's request to instead treat this as like a Franks motion and whether he made a substantial preliminary showing to get a Franks hearing, we believe that Coleman also met that burden. Did you raise the issue below, though? Because my understanding of the record is that when the defense made the argument attacking the warrant, it was based upon the assumption that the statements in the affidavit supporting the warrant would all be true. And that seems to me very different from a Franks hearing where defendants are arguing that the assertions in the affidavit are basically false or fraudulent. Judge Lee, I believe you're referring to the initial Franks hearing pretrial? Yes, I agree that. And we're not challenging any of the rulings pretrial on the Franks hearing. Although it was titled a Franks hearing pretrial and the motion was stylized as a Franks motion, I completely agree that the substance of their claim was just that they lacked probable cause based on the affidavit. And assuming the affidavit's true, the court did not err on finding probable cause. That allegation that Coleman and his girlfriend Katrina were moving back and forth between buildings, that's clearly probable cause. It's on the post-trial motion that it does create a substantial preliminary showing of either material misrepresentation or material omission in the original affidavit. And I think if you go back, though, and look at the initial pretrial proceedings on the affidavit, everyone is assuming that when they're referring to recordings from the surveillance van that it is existing recordings, not real-time surveillance. They're not using recording in the sense that there's a camera and someone's watching it. They're referring to recordings in the normal sense of the word that it's making a record. There is a document, there's footage, there's something that exists that the government will be able to provide later. Mr. Roy, when did Coleman's trial counsel first learn that there had been a problem with surveillance video recording? And I don't have a good answer for that question, Judge Rovner, because he had a new lawyer when he filed the motion for a new trial. His trial counsel withdrew. We knew that his trial counsel knew something about issues with the van because it did come up at trial, but we don't know to what extent his original trial counsel knew that there was defects in the surveillance van. So I take it then you aren't, well, I better take nothing. In preparation for trial, did Coleman's trial counsel ever request access to the surveillance video? Do you know? We do not know because it's not on the record. And that is the type of thing that would need to be hashed out at an evidentiary hearing. And it's very popular. Yeah, I'm sorry. Oh, go ahead, Judge Rovner. No, you were going to say it's very possible. I think it's possible that at an evidentiary hearing, they would subpoena the original trial attorney, may require Coleman to waive privilege to work product, and have fact-finding on whether the first attorney was aware of this. And it's totally possible that the second attorney, when filing the motion for a new trial, did not know what the first attorney was aware of, and that would be a reason he could lose after an evidentiary hearing. Do you think that the jury thought it somewhat odd that it never saw any of the surveillance video? And did anyone ever explain to the jury why they were not seeing the video? I do not believe they explained to the jury why they didn't see it. They instead focused on relying on Katrina as their star witness. We're not challenging the sufficiency of the evidence, though, and we're not saying that disclosure of the errors in the ban would have made a difference in the trial presentation, only that it would have been beneficial for the Franks proceedings in filing a more substantive Franks motion. It could have been useful as impeachment evidence if they were able to work off of the disclosure, show that Murray misrepresented something in the affidavit. The impeachment evidence wouldn't be impeaching the video surveillance. It would be impeaching Murray's personal credibility. However, our primary claim is that it would have helped with pretrial suppression. Spend some time on the constructive amendment. Absolutely, Judge. For the constructive amendments. Obviously, we disagree with the government that the claim is waived. I think that this court's other cases involving claims of constructive amendment where there hasn't been objections. This court is routinely found forfeiture instead of waiver. We laid out in our brief. There's cases of Pearson, multiple other cases, Pearson, Withers, like them. Those all had no objections to the jury instruction. But the court did not find waiver. It went moved on to plain error review. And we completely concede the issue is forfeited and that it's plain error. However, we do think that the error. If we find forfeiture, you know, you still have to allege a plain error that affected his substantial rights and affected the fairness and integrity of the judicial system. Absolutely, Judge. And our position is that we do need to make that showing because that's the standard that applies. And we think we we can make that showing. In terms of the error being plain, this case is almost substantively identical to Pearson, although in Pearson, the error was not plain. Pearson made a substantive ruling on whether a constructive amendment occurred in that case. Now, this court has guidance. District judges have guidance. We know what states a constructive amendment when there's multiple guns at issue. I will. I will be interested to hear what the government has to say about. Pearson, actually. OK, we do agree with the government that Pearson is still persuasive authority on the third and fourth prongs of plain error, since that's not something that the substantive holding in Pearson would affect. But there are some differences in this case. The big one being that Coleman had on prong three a defense for the Glock specifically. The Glock was the one gun that could have been Katrina's gun instead of Coleman's gun. And so the government had to show that it wasn't Katrina's by having Katrina testify. I didn't know about any guns. This gun wasn't mine. But we do know the jury rejected other parts of Katrina's testimony, because if the jury had credited everything Katrina said, it would have found Coleman responsible for the specific distribution charges on which it acquitted Coleman. Because Katrina's testimony was that he directed those distributions. So I think there's a reasonable probability of prejudice in that he had a strong defense on the Glock. He didn't really have a defense on the other two guns. I mean, they found him in the search, but the jury then could fall back on those guns. And the government primed the jury to do so by repeatedly saying there was multiple guns, opening statements, you're going to hear about guns, multiple guns he wasn't supposed to have. It's true that they clarified a couple times that the Glock was the only gun at issue, but that's no different than Pearson. How did the other guns come in as evidence, just as part of the search and the argument that drug dealers use guns and so the other guns are relevant? Yes, that's exactly right, Judge Lee. The guns were brought in as evidence, and the argument was that drug dealers use guns. It's evidence that he was a drug dealer. They had, I believe there was an expert that also testified about common characteristics of drug dealing, which includes guns to protect the drugs. And we agree it's relevant for that purpose, since we didn't challenge the expert or anything like that. On the waiver issue of the constructive amendment, you cite in your brief a case called Bell. Bell found there was waiver. You attempt to distinguish Bell by saying this is a more complex set of circumstances. Exactly. What does that mean? How is this more complex than Bell? Well, I think our distinguishing of Bell is a little bit different, and Bell is the case the government, I think, primarily relies on to find waiver. Bell didn't really have a thorough discussion of what the substantive claim was, so it's not clear reading the opinion in Bell whether the defendant was challenging only the jury instructions or if they were challenging a Pearson-style, Leaknum-style, this case-style argument that a constructive amendment was created by jury instructions, evidence, arguments at trial, and that everything came together. So if the government or defense counsel had asked for a specific limiting instruction from the court, saying that, you know, ladies and gentlemen of the jury, with regard to these other guns, that's not relevant to your consideration of the felon possession count, would that basically address your argument that it was constructively amended? Yes, and I think, Judge Lee, that goes to prongs three and four of plain error, in that if he had objected, they got a corrective. So I guess my question is, what's the difference between the – substantively, from the jury's perspective, from hearing from the judge that you can only consider the Glock with regard to the counted issue, and then the government later on in closing saying the Glock is only – the only relevant gun with regard to this count is the Glock? I think there's a big difference to the jury between what they hear from the judge in jury instructions versus what they hear from the government in closing argument. And you would know, Judge Lee, from experience in the district court, it's very common for juries to be instructed. Arguments aren't evidence. You're not supposed to consider arguments as evidence. You're supposed to follow my instructions. What I say are the instructions of the rules. So I do think a lot of juries are sitting there with the jury instructions. They have the list of elements. They're marching through them together as a jury. The element says, A, firearm. It doesn't say the Glock. And it's true, as the government points out, they did have a copy of the indictment as well. However, that's no different from Pearson, where they had the indictment in that case too. Do you want to reserve the remainder of your time? I will. Thank you, Judge. Thank you, Mr. Roy. Mr. Whalen, we'll move to you now for argument on behalf of the government. Thank you, Your Honors. May it please the Court, Nathaniel Whalen here on behalf of the United States. The district court did not plainly and constructively amend the indictment. It did not abuse its discretion in denying Mr. Coleman's motion for a new trial, and there was no error it's sensing, so that we ask that you affirm his convictions and sentence. Judge Rovner, you're interested in hearing from me, and I don't want to keep you waiting, so let's hop to the constructive amendment argument. How about the other two? We'll just let them wait, right? What facts do distinguish this case from Pearson? Sure. The biggest fact that distinguishes this case from Pearson is the actual guns themselves in the interstate commerce stipulation. Pearson involved the exact same gun twice. It's a .45 caliber Taurus brand handgun manufactured in Brazil, both of which were stolen. That's what this court identified in Pearson. When you have the exact same gun twice, and you tell the jury you have to convict based on a .45 caliber Taurus brand handgun manufactured in Brazil that was stolen, it's going to be hard for the jury to figure out which one they're convicting on. In this case, the defense argues in his opening argument here that there was no defenses to the other two guns. I kind of flip it. We didn't prove the convictions to the other two guns because there was no interstate stipulation as to those two guns. What the interstate stipulation in this case said, and it's page 339 of the transcript, is that the parties agree and stipulate the Glock firearm, Exhibit 4, charged in Count 4, was manufactured outside the state of Indiana and therefore traveled in interstate commerce. There is no interstate stipulation or evidence as to either of the other firearms introduced in this case. So if the jury goes through the instructions, as the defense counsel rightfully says, marches through the elements one by one, they get to the interstate element, there's only one gun that potentially applies, and that's the Glock. And that's the one we referenced over and over in closing statements. We didn't tell the jury to ignore the interstate element. We don't tell the jury to ignore elements of the offenses. What we said on page 410 is the defendant's possession of the firearm was in or affecting commerce. That fact has been stipulated, too. There's only one stipulation as to interstate commerce, and that's to the Glock. It could not be clearer that we're talking only about the Glock for the interstate element. Then we continue to say in closing, as Judge Lee noted, we remind you Exhibit 15A, that's the firearm in question. 15A is a picture of the Glock on the bed. We continue, it's the Glock found at the apartment building. We continue, the Glock was found in between the mattress on the bed. We ask the rhetorical question, how do we know that K.D. knowingly possessed the Glock? Page 411, it was found under the mattress of the bed that he and Katrina slept on. You know, we referred to the Glock over and over and over again in this case, and the Glock was the only one that had traveled in interstate commerce. Pearson establishes a rule that if you introduce – Pearson reiterates the rule from Leichman that if you give a general instruction relating to any firearm, but you've only charged one firearm, and then you introduce evidence of multiple firearms, that's an error. That's what this court said in Leichman on de novo standard of review in Leichman, by the way. It's what the court reiterated in Pearson. And then the court engages in the plain error analysis of Pearson and asks, is it plain on the facts of this case that the jury would have acquitted on an uncharged firearm? And that's where the court kind of looks at the specific factors in Pearson about what did the government argue? What did the instruction say? You know, would the jury have been confused about which gun we're talking about when we have two .45 caliber – I want to get this right – two .45 caliber Taurus brand handguns manufactured in Brazil? Here we don't have those concerns. We have, I think, more specific references to the actual gun charged in this case during closing arguments than in Pearson. We have this indictment going back to the jury. We have the court telling the jury – I'm sorry. We have the court telling the jury on page 24 and 386 that the charges against the defendant are in the indictment. And they're going to look at the indictment, and the indictment itself says – I want to make sure I get this language exactly right. The indictment references the Glock with the specific serial number. There's only one Glock being introduced. There's only one serial number that's discussed at trial. Another difference in this case between Pearson is we actually have an instruction from Judge DiGiulio on page 390. The defendant is on trial here for the charges specified in the indictment, not for any other crimes. That was not at issue in Pearson. And this court actually in Pearson references United States v. Lopez. It quotes it about how that instruction saying not only are you looking only at the charges in the indictment, but you're looking only at the charges in the indictment and no other crimes. That's a different instruction than was at case in Pearson. So Pearson might be good law, and it might be a plain, obvious error if you're dealing with two .45 caliber guns manufactured in Brazil, both of which were stolen, both of which were similar appearance, where the prosecutor referenced the gun six times in closing arguments, twice specifically pointing to the gun. It's probably plain errors to that particular case. But as the court noted in Pearson, whether constructive amendment occurred is a fact-intensive question, and the facts of Pearson's case do not lend themselves to clear application of this circuit's precedent. The facts of Mr. Coleman's case still don't allow themselves to a clear application of this circuit's precedent because the circuit's precedent still isn't clear as to what combination of factors renders any error plain. Even if the court has any concerns about the second prong, it's the defendant's burden to meet on the third prong to show that there was no prejudice. Here the defendant's sleeping on the gun. This is the only gun where we proved all the elements of the offense. Could a jury have disbelieved Katrina that the gun was hers? It could have. Does that meet the defendant's burden on plain error to show he wasn't prejudiced? It does not. Your Honors, unless the court has any questions on that, we'll move to the new trial, or I guess I will move to the new trial argument. Judge Brennan, to answer your question, on docket entry 389, the defendant asks for a new trial. I guess to his credit he says all other relief just inappropriate, and no point does he ever ask for a specific hearing. I don't know why this court would adopt a lower standard for a post-trial Franks hearing than a pre-trial Franks hearing. The defendant's position is if they allege some facts and maybe show they're entitled to a hearing, that's enough. They don't have to allege a substantial preliminary showing. I guess I don't understand why that would possibly apply when we're dealing with the exact same constitutional issue. Even if you do take his argument and say that you can use the 2255 standard for pleadings to get a hearing, well, the standard in 2255 pleadings is the allegations as alleged entitled the defendant to relief unless the record conclusively shows to the contrary. Here, Judge DiGiulio heard from TFO Murray three different times under oath, at the initial Franks hearing, at trial, and at the sentencing hearing. And Judge DiGiulio found, as a matter of fact, that there was a recording. There had been an issue with transferring it to a physical device, but there had been a recording. And what TFO Murray found and Judge DiGiulio credited was that there's this real-time recording, goes up to a cloud-based system, and then there was a malfunction when you transfer it from the cloud-based system to a physical device. So Judge DiGiulio found on Appendix 43, Note 4, specifically, that there was a recording. Defendant has not shown that finding was clearly erroneous. And with that— When did the government first learn that the videotapes were unusable, and when was that information conveyed to the defense counsel? Your Honor, that information isn't in the record as to when we first learned that they weren't usable. And, you know, Mr. Coleman's right, the information as to when he first learned about the malfunction is also not in the record. He correctly notes, though, that defense counsel at trial did ask about a malfunction in the recording equipment. It's our position that at that point he knew that it was unusable, or at least that's what the record shows. Ultimately, when he knew the recording was unusable isn't the relevant question. The relevant question is when did Officer Murray know that the recording was unusable? And there's no evidence in the record anywhere suggesting that happened before he submitted this affidavit. TFO? TFO Murray, I'm sorry. Yes. Thank you. In stating that the jury must have known that there was no surveillance video, your brief notes that, and I'm quoting, Detective Slatton had already testified that there was something wrong with the recordings. When I looked at that testimony, it looked like the government had asked him and there was something wrong with it, right? Something broke down. The batteries? And Detective Slatton answered at some point, yes. I believe so, maybe. Do you think that was enough to let the jury know that the whole of the video was unusable? I think that, given with the fact that the videos weren't introduced, is enough to know that these videos don't exist in usable form. But I also don't think it matters whether the jury knew that these videos existed in a usable form. The defense isn't getting up here and arguing that there's a trial issue that was potentially affected the outcome of the trial or Judge DiGiulio abused his discretion by withholding, by not fleshing this issue out at trial. The defense's only argument has ever been they could have impeached TFO Murray with the absence of a video. Judge DiGiulio didn't abuse his discretion in rejecting that argument. He sat through the trial. He said, you know, you didn't introduce the videos. The jury would have known the videos at least weren't being introduced, if nothing else. They would have known there was an issue with the videos by TFO Sladden. And whether or not you can say, you know, there was a recording issue, that's not going to impeach him, especially when Judge DiGiulio found, as a matter of fact, that there was a recording. At the very least, he didn't abuse his discretion in denying the motion for new trial based on that. Your Honor, just one other point on the Franks argument. Even if there were no videos, what this court should do is excise the reference to the videos in the actual affidavit and ask whether there's probable cause. In paragraph 12, the investigators or TFO Murray swears that investigators had observed Katrina Owens and Lamont Coleman conduct the same activity prior to several of the controlled purchases detailed above in this affidavit. There's an entire section in the affidavit called controlled purchases where he lists out 14 different controlled purchases prior to this recording. So that's what he's referring to, at least in a non-technical, common sense manner. I understand Mr. Coleman says that there are other buys referenced in paragraph 12, and he's right, but none of them are controlled purchases. And TFO Murray says we observed that prior to several of the controlled purchases detailed in the affidavit. Well, I must tell you that telling the jury that the batteries broke down at some point, to me, is a far cry from telling a jury that the video recordings were unusable in total. I don't think that, you know, the statement amounts to any kind of material misstatement, but I do wish the government could have been more upfront about the lack of the video recording under all of these circumstances. Well, Your Honor, I don't think it would make sense. I respectfully disagree, and I think Judge DeGiulio sat through the trial, basically found it was conveyed to the jury that there was no usable video. You know, he sat there through the whole case, and that was his takeaway. I don't think that the government was under an obligation to tell the jury, not defense counsel, the jury, that some videos were not going to introduce that don't support the counts charged, these controlled buys. There was a malfunction with them, you know, and defense has never argued that they wanted to play the absence of the videos or anything like that to the jury. They're saying we could have impeached T.F.O. Murray. They don't ask T.F.O. Murray about the videos themselves, and they've never said any line of questioning they could have impeached T.F.O. Murray with, and that's what Judge DeGiulio says in his post-trial order. I would really like to get to Leroy's affidavit because I want to make absolutely certain that we're not conflating two things, whether an affidavit is reliable and whether it is admissible. I agree that the district court likely should not have placed much, if any, reliance on the affidavit for the truth of the matter, but was it inadmissible? It was not inadmissible for sentencing purposes, and to the extent that Judge DeGiulio said that, as we noted in our brief, that would have been an error. Had he stopped there, that would have been problematic, but he doesn't stop there. It's important to read his actual comments within the context of his entire sentencing order and the transcript itself and not just isolate this footnote because if the court reads, as I know the court will, starting with page 16 of defendant's appendix all the way through page 22, Judge DeGiulio is dealing with the content of the affidavit. He says, Leroy claimed in a recorded jail call conversation that he and Mrs. Owens were the leaders of the operation, and then Judge DeGiulio finds this assertion contradicts Ms. Owens' trial testimony and the observations of the investigators during the surveillance. On page 22 of the appendix, he says, the notion that Leroy was responsible for the drug trafficking runs contrary to Leroy's prior statements to the investigators as well as the overwhelming evidence at trial. So the content of the actual affidavit itself is during a phone call, Leroy stated, me and Trina ran the operation. Lamont Coleman was either at work or at school. Judge DeGiulio dealt with that argument. He said he disagrees as a factual matter having sat through the whole trial that that's consistent with the evidence, and so he made a credibility determination between the affidavit and the recording and what he actually heard at trial. That credibility determination is entitled to exceptional deference on review, and it was not clearly erroneous. Well, it's one thing for a judge to say it's unreliable and that he has not relied on it in making any determinations about sentencing, but it's another, the way I view things, to say that it is inadmissible. The judge is always free to discredit the substance of the claims in an affidavit, but I think that's a very different issue than determining admissibility. May I quickly reply? Your Honor, I agree with that, and that's why we acknowledge that it would be erroneous to say that it's inadmissible and just stop there. If the court continues reading the footnote, the court then talks, Judge DeGiulio says there's no testimony offered about the foundation so as to indicate any indicia about its reliability. So he brings it back to reliability and not inadmissibility. Then in his next sentence he admittedly goes back and talks about admissibility again, but he says it would change nothing if it were admissible because what it states is inconsistent with the trial evidence about the roles of each member of the conspiracy. And the entire sentencing order goes through all the evidence that supports that Lamont and not Leroy is the head of this conspiracy. For those reasons, we ask that you affirm Mr. Coleman's conviction and sentence unless there are no further questions. Thank you, Mr. Whalen. Thank you, Your Honor. Mr. Roy, we'll go back to you. We'll give you the full three minutes for rebuttal. Thank you. I'd like to start first with the government saying that it should be the Frank standard that applies to whether a hearing was held instead of a separate Rule 33 standard. We think that even if it is the substantial preliminary showing required for a normal Franks hearing, Coleman has met that. The case United States versus Clark cited in the government's brief, that lays out what's required for a substantial preliminary showing. The main point we want to make is it's a burden of production. The court's not weighing the evidence against other evidence. It's not weighing it against the government's explanations. It's looking, and this is a quote from Clark, whether the evidence, quote, permits but does not require an inference, unquote, of a Franks violation. There's enough here for that. We don't see the possibility that there was material misstatements or omissions in the affidavit. That's all that's required for a hearing under Franks. What about the government's argument that suppose you are right, and then we basically excise the references to the video, and according to the government, at least, there's still enough there to support the warrant? We disagree that there's enough without the videos to support the warrant. As the district court explained when finding probable cause, the sum and substance of the probable cause was from the purported recordings. The other evidence tying Coleman specifically or his apartment to the drug activity was fairly weak. There was a lot of evidence that there was drug activity in the apartment building, but they needed probable cause to search Coleman's specific apartment, not just to search the apartment building. And that could be either evidence tying it to that unit or evidence tying it to Coleman as the resident of that unit. But most of the evidence besides the recordings is pretty weak. It was that there was a confidential informant who said Katie was the person, but there's no information about how this confidential informant knows Katie, why they should be considered reliable, whether they're a rival dealer or someone who has a grudge against him. There was some allegation about the phones being in contact, but Coleman's the landlord. He has friends and relatives who live in the building. Of course he's in contact. They do allege he's in contact with the drug phone, but it's not clear if they're referring to phone calls or just cell site location that they're in the same place, which again, would be expected in an apartment building. The main thing tying it to Coleman specifically and to his apartment specifically is the recordings. I do want to really quickly talk about the affidavit at sentencing as well. We agree with Judge Rovner that the issue is about admissibility, not whether the judge could weigh the evidence one way or the other. We read the court's alternative ruling different from the government. We don't think the court was saying if admissible, it's outweighed by other evidence. The court said even if it's admissible, it's not helpful because it contradicts the trial testimony. That reads like the court is thinking that anything that contradicts the jury trial evidence is not something that can be considered at sentencing, would have made sense if he was convicted on all charges, but he was not. Courts can consider contradicting evidence at sentencing. Thank you, unless the court has any further questions. Thank you, Mr. Roy. Thank you, Mr. Whalen. The case will be taken under advisement. Judge Rovner, should we take a break? Yes, that would be great.